## AT MILLEDGEVILLE,

## JUNE TERM, 1868.

Present—HIRAM WARNER, *Chief Justice.*
IVERSON L. HARRIS, } *Judges.*
DAWSON A. WALKER, }

---

The Central Railroad and Banking Company, plaintiff in error, *vs.* JOHN E. WARD, *et al.*, defendants in error.

JOHN E. WARD, *et al.*, plaintiffs in error, *vs.* The Central Railroad and Banking Company, defendant in error.

1. Where the complainants claimed title to fifty shares of Central Railroad stock, purchased from those who derived their title thereto under a judgment, and proceedings there under, of the District Court of "the Confederate States of America, for the Southern District of Georgia," confiscating said Railroad stock, as the property of citizens of another of the United States, as being *alien enemies,*
*Held :* That the purchasers of said Railroad stock, deriving their title as aforesaid, did not acquire a legal and valid title thereto, so as to defeat the title of the original owners of the stock, and that said Company could not be required to transfer to such purchasers, a certificate of ownership of the stock upon the books of the Company—HARRIS, J., dissenting.
2. *Held,* also, that the Company, in the absence of any fraud or collusion, was not liable, as a *guarantor* of the vendor's title to the stock, in case of failure thereof, by merely allowing the transfer of the stock to be made on the books of the Company, as provided by the charter, under the state of facts presented by the record in this case.

Equity. Decided by Judge FLEMMING. Chatham Superior Court. February term, 1868.

John E. Ward and George S. Owens, filed their bill of complaint against the Central Railroad and Banking Company, of Georgia, which was in substance as follows:.

On the 5th day of June, 1866, John E. Ward made a sale to George S. Owens, of fifty shares of the Capital Stock of the Central Railroad and Banking Company of Georgia, an incorporation under the laws of the State of Georgia, and constituted and appointed J. R. Saussy, his attorney to make and execute all necessary assignments and transfers of said stock. George S. Owens, on the 26th day of June, 1866, after said sale so made to him, requested the proper officers of the Central Railroad and Banking Company, of Georgia, at the proper office of said corporation, in the City of Savannah, within the usual hours of business, to permit the said J. R. Saussy, the attorney of John E. Ward, to make the transfer of the said fifty shares of said capital stock upon the books of said corporation, from the name of John E. Ward, to the name of George S. Owens, and to make out a new scrip to said fifty shares of capital stock, to George S. Owens. The Central Railroad and Banking Company of Georgia, through its proper officers, refused so to do."

The prayer was that the Central Railroad and Banking Company of Georgia, should answer all and singular the matters and things herein before stated, and that by its proper officers, it should be decreed to permit the said J. R. Saussy, as attorney, as aforesaid, to make, upon the books of said corporation, the transfer of said fifty shares of capital stock to said George S. Owens, and to make out and issue to him scrip for said fifty shares of capital stock, and for general relief.

The Central Railroad and Banking Company of Georgia, filed its answer to said bill, in substance, as follows:

This defendant admits that application was made to its officers, and at its office, in the City of Savannah, for the transfer of fifty shares of the capital stock of said Company, then standing on the books of said Company, in the name of the complainant, John E. Ward, to be made to the complainant, George S. Owens, in the manner stated in complainant's bill, and that this defendant, through its proper officers,

declined to have the entries desired made on the books of the Company, and to issue a new scrip or certificate for said fifty shares of stock to complainant, George S. Owens, as requested by the said J. R. Saussy, acting as agent for the complainant, John E. Ward.

Defendant further answered, that the fifty shares of stock standing in the name of the said John E. Ward, complainant, was part and parcel of eight hundred and seventy-eight shares which appeared on the proper books of defendant, in the names of sundry persons then treated as alien enemies to the then Confederate States of America, which defendant submits was then existing as an organized government, with sufficient power and authority to enforce its mandates and decrees, and under the laws of the Congress of the said Confederate States, certain proceedings were instituted in the District Court of the Confederate States of America, for the Southern District of Georgia, to sequestrate the property of alien enemies; and after garnishment served on this defendant, under said proceedings, and return made to the same, the said District Court, at the February term, in the year eighteen hundred and sixty-two, ordered defendant, in regular course of judicial proceedings, to transfer all the stock held by the said persons, to the Confederate States Receiver, for the Southern District of Georgia.

Defendant further answered, that in pursuance of the said order of the said District Court, for the Southern District of Georgia, a copy of which was duly served on defendant, the said shares of stock then standing on the books of the said Company in the names of the said persons, so treated as alien enemies of the said Confederate States, and amounting in all to eight hundred and seventy-eight shares, were transferred to Wm. C. Daniell, then Receiver of the Confederate States, for the Southern District of Georgia, the 3d day of May, 1862, and certificates were issued in the name of the said Wm. C. Daniell, Receiver, for said number of shares of stock.

William C. Daniell, Confederate States Receiver, under the orders, decrees and directions of the said District Court, for

the Southern District of Georgia, made and rendered, in due course of judicial proceedings, did sell and dispose of said shares of stock, so sequestrated, and did transfer the same on the books of defendant, and amongst others, on the 3d day of September, 1862, transferred one hundred shares of said stock, on the books of said Company, to Octavus Cohen, and the said Octavus Cohen also transferred fifty of said one hundred shares to Solomon Cohen, on the 10th day of September, in the same year, and the said Solomon Cohen, on the 17th of April, 1863, transferred said fifty shares of stock to the complainant, John E. Ward, in whose name the same now appears on the books of defendant, and defendant averred that all these transfers were made, and acts done, while the Confederate States of America existed as an organized Government, with power to enforce its mandates and decrees, and that defendant, during all that period of time, acted in accordance with such mandates and decrees.

Since the date of the said transfer to the said John E. Ward, and before the application of the said complainant, John E. Ward, through his attorney and agent, to have the said fifty shares of stock transferred, and a new certificate issued in the name of the complainant, George S. Owens, as set forth in complainant's bill of complaint, to wit: on the ................day of.............. 1865, the said Confederate States of America ceased to exist as a distinct and organized government, and the said persons whose stock was transferred, on the ground that they were alien enemies of said Confederate States, having been, during all this time, citizens of the United States of America, notified defendant that they claim the re-transfer of said shares of stock to each of them respectively, as all the judicial proceeding in the Courts of said Confederate States of America, were without authority of law, and null and void, and all property and titles derived under the same, are also null and void, and of no value. Defendant, being now without the protection of the Courts of the late Confederate Government, is advised that it is unsafe to allow any transfers of such stock to be made on its books, or to issue any new scrip or certificate, based on the same,

or to take any step whatever which will tend to decide on the relative merits of the claims of the parties in whose names the said stock now appears on its books, and of those in whose names the same appeared before the judicial proceedings hereinbefore set forth and referred to, without the sanction, order and decree of Court.

Defendant answered that it had no interest whatever in the question of title to the said shares of stock, and had been only an intermediate agent in all the transactions hereinbefore set forth, desiring instruction and protection as such, and prayed that the original shareholders, whose names appear on the list marked Exhibit A, against whom said judicial proceedings in the Courts of the Confederate States of America were directed, and which resulted in the transfer of said shares of stock from their names, and who now claim the same from this defendant, may be made parties to this suit, and required to litigate, as to their rights in the premises, with the said complainants, and defendant prayed the instructions and protection of the Court.

To the answers were attached as Exhibits, a list of said stockholders and a copy of the proceedings in the said District Court.

The special jury, on the said cause being submitted to them, returned the following verdict, taken by consent for the purpose of submitting the questions of law to the Court.

"We, the jury, find that the facts set forth in the answer of the defendant, the Central Railroad Company, are true, and that the stock was transferred at the times mentioned in said answer, and that Solomon Cohen, mentioned in said bill and answer, was at the time he transferred one hundred shares of the stock mentioned in said bill and answer, to John E. Ward, the complainant, possessed of other stock in the said Central Railroad and Banking Company; this decree rendered subject to the opinion of the Court as to the law controlling the case. March 7th, 1867.

GEO. W. DAVIS, Foreman.

Besides the bill, answer and verdict, there was an agree-

ment signed by the solicitors of the complainants and of the defendants, which is as follows:

" Upon the argument of the above entitled case it is agreed, that the fact is admitted that the complainant, John E. Ward, purchased the shares of stock without knowledge that the same had ever been confiscated and without notice to that effect. And that without reference to said verdict, the argument is open to complainant's counsel, that the transfer to the said John E. Ward, was a voluntary one on the part of the Bank, to the extent that it was not made under an order of Court, but that after the first transfer, which was made under the order of the Confederate Court, the Bank continued to transfer the same stock as long as the Confederate States, under the direction of whose authorities the transfer was originally made, continued a government."

Upon these papers said cause was argued, and the Court held that the defendant under the facts did not warrant the title to said stock, to Ward, nor become in any way responsible therefor; that the owners of the said stock, at the time of confiscation, lost their title by confiscation; and therefore had no right to be made parties to the bill; and believing that the Confederate States of America was such an one as could confiscate said property, and had done so, ordered that the defendant permit J. R. Saussy, as the attorney of J. E. Ward, to make upon its books the transfer of fifty shares of capital stock, to George S. Owens, and make out and issue scrip to the said George S. Owens for said fifty shares of capital stock.

To which decision and judgment the said Central Railroad and Banking Company of Georgia, by its solicitors, excepted and assigned as error:

That the Court erred, 1st, in deciding that the government of the late Confederate States of America, had the right to sequestrate the property of citizens of the United States of America, classing the latter as "alien enemies." 2nd, in deciding, that under the Sequestration Acts of the said Confederate States of America, the "Receiver" under said Acts, took a good title to property and transmitted the same

The Central Railroad and Banking Co., *vs.* Ward *et al.*

through other parties to the complainant.    3d, in deciding that the owners of the shares of railroad stock before the alleged confiscation, had no interest whatever in said shares, by reason of said alleged confiscation.    4th, in ordering that the Central Railroad and Banking Company of Georgia, should permit a transfer of stock to be made on its books, by the complainant, claiming said stock under said Confiscation Acts, and should issue new scrip to the person to whom said transfer should be made.

Ward and Owens, by their solicitors, also excepted to said decision in so far as it held that the defendant did not warrant the title to said stock to Ward, or become any way responsible to him therefor, he being a *bona fide* holder for value without notice of any cloud on the title to the same.    They sued out their writ of error, also.    The cases were consolidated and argued together.

JACKSON, LAWTON & BASSINGER, for the Corporation, reviewed the Prize cases, 2 Black., reading from pp 666, 667, 670,672–3–4; cited "Mrs. Alexander's cotton" case, 2 Wallace, 404; Wheaton's International Law, 74; 9 Vesey's Ch. R., 347; 3 Wheaton, 324, and opinion of Chief Justice Chase, in American Law Review, to show the *status* of the Confederate States government.    As to the Corporation being liable as warrantor to Ward, they cited its charter and A. and A. on Corp., 436–7 and 447.

LOYD, HARTRIDGE & CHISOLM, for complainants, relied on said Prize cases, 2 Black.; Vattel, 425; 7 Wheaton, 337; 2 Wallace, 419; Act of U. S. Congress, 13th July, 1861, and Sequestration Act of C. S. Congress, 30th August, 1861, the 34 Geo. R., 367, as to the *status* of the Confederate States government, and contended that, though the title could not be sustained on the basis of said sequestration being legal, yet as against Ward, a *bona fide* purchaser, the Corporation was estopped, and to this point cited 4 Duer's R., 525, 541, 563, 575 and 593.    2 Bingham, 407.    38 Barbour, 340.    4 Conn., 544.    5 Conn., 245.    6 Conn., 552.    Parson Select Eq. Cases, 247.    3 Paige, 362, and 22 Wend., 362.

WARNER, C. J.

There are two questions presented by the record in this case for our consideration and judgment. First, whether the complainants, and those under whom they claim, acquired a *valid title* to the fifty shares of the Central Railroad stock under the judgment, and proceedings had, in the District Court of the Confederate States? Second, if they did not, is the Central Railroad Company liable as a warrantor of the title of the stock transferred on the books of the Company to the purchasers thereof, under the proceedings had in said Confederate Court? The Court below decided that the complainants acquired a *valid title* to the fifty shares of stock; but also decided that the Company would not be liable as a warrantor of the title to the stock, in the event of the failure of title in the parties from whom the complainants purchased the same. Both decisions of the Court were excepted to, and are now assigned for error here.

It appears from the record, that the fifty shares of stock now in controversy constituted a part and parcel of eight hundred and seventy-eight shares of the capital stock of the Central Railroad and Banking Company, which appeared on the books of the Company to have been held and owned in the names of sundry persons on the record mentioned, who were *citizens of the United States of America,* and have continued to be so *all the time.* These eight hundred and seventy-eight shares of stock were sequestrated as the property of *alien enemies* by the judgment of the Confederate Court, and the Company directed to transfer the stock upon their books to the Confederate States Receiver, Wm. C. Daniel, which was done on the 3d day of May, 1862. Afterwards, Daniel, as Confederate States Receiver, under the order and decree of said Court, sold the said shares of stock so sequestrated, and transferred the same on the books of the Company. On the 3d September, 1862, Daniel, the Receiver as aforesaid, transferred one hundred shares of said stock on the books of the Company to Octavus Cohen, and the said Octavus Cohen

The Central Railroad and Banking Co., *vs.* Ward *et al.*

transferred fifty of said one hundred shares to Solomon Cohen, and Solomon Cohen, on the 17th April, 1863, transferred said fifty shares to one of the complainants, John E. Ward.

1. Did the complainants, or those under whom they claim, acquire a legal and valid title to the fifty shares of stock, as against the original owners thereof, under the judgment and proceedings had in the Confederate Court, as set forth in the record? The answer to this question will depend upon the fact whether the original owners of this railroad stock, being citizens of the United States, were *alien enemies* to the citizens of the State of Georgia, another of the United States, constituting the United States of America, as recognized by the Constitution thereof, and whether the Confederate Court had the *lawful authority* to adjudge them to be so, as stated in the record. The judgment of the Court below, is based upon the idea of the *legal* right of separate State secession from the Federal Union; that by the act of secession, Georgia became an independent State or nation, and that the late war was a contest between separate, independent States or nations; or, at least, it was a *civil war* between the States, and that the citizens thereof were *alien enemies* to each other, and their property liable to confiscation under the proceedings had in this case.

The important question to be decided is, what was the *political status* of the State of Georgia and the people thereof during the war, and at the termination of the war, according to the fundamental principles of international law and the fundamental principles of the Constitution of the United States? If the State of Georgia had the *legal* right to secede from the Federal Union, and thereby became an independent State or nation, *outside* of the Federal Union, and, as such, was conquered by the government of the United States, as an *independent State or nation*, then her citizens were not entitled to claim any protection under the *provisions of the Federal Constitution.* They might have been *lawfully* placed under military government by the conqueror, and dealt with as the recognized principles of international law prescribe, until again admitted into the Federal Union, as provided by the

Constitution thereof. But a majority of this Court, during the present term, in the case of Chancely vs. Baily & Cleveland (*post*) have held and decided that the State of Georgia could not *lawfully* secede from the Federal Union, that by her own *voluntary, executed compact*, she constituted an *integral part* of the political sovereignty of the government of the United States of America; that, having in her sovereign capacity, *voluntarily granted* certain powers enumerated in the Federal Constitution, for the expressed purpose of forming and creating that government, in order to form a *perpetual* Union of the States, of which she was one, she could not, afterwards, *resume* or *reassert the powers so granted*, and thereby destroy the *unity* of that government of which she constituted an *integral part*, except by *successful revolution*, which has not been accomplished. The reasons for that decision will not be again repeated here. From this conclusion, as to the *legal* right of separate State secession from the Federal Union, it necessarily follows that the orignal owners of the railroad stock, being citizens of any one of the United States of America, were not *alien enemies* to the citizens of the State of Georgia, another of the United States, in any *legal sense* of that term. By an act of Congress, passed in 1798, it is provided that in case war shall be declared between the United States and any foreign nation or government, the *citizens of such foreign nation or government*, within the United States, shall be recognized as *alien enemies*. United States Statutes at Large, 577. The original owners of this railroad stock were not citizens of any *foreign* State or nation. This Confederate Court mentioned in the record, derived its authority solely from an organization of several of the States of the Federal Union, which *attempted* to secede therefrom, but *failed to do so*. That organization of assumed seceded States, for the purpose of resisting the government of the United States, was in violation of the supreme law of the land, as declared by the Constitution of the United States—as was held by a majority of this Court in Chancely vs. Baily (*post,*) consequently that Court, deriving its sole authority from that organization did not have the *lawful* jurisdiction to adjudge and determine,

that the original owners of this railroad stock were alien enemies, or to confiscate and order a sale of their property as such, as set forth in the record.   Therefore, the purchasers of said railroad stock under the pretended authority of such judgment and sale, acquired no legal or valid title thereto.   When the rights to property are sought to be changed by the sentence of a judicial tribunal, the power and authority under which it acts must be considered and looked into.   It is for governments to decide whether they will consider a colony which has separated herself from the mother country an independent nation.   Until such decision shall be made, or the mother country shall relinquish her claim, courts of justice must consider the *ancient state of things as remaining*.   Rose vs. Himely, 4 Cranch's R., 241.   "It belongs exclusely to governments to recognize new States in the revolutions which may occur in the world, and until such recognition, either by our own government, or the government *to which the new State belonged,* Courts of justice are bound to consider the ancient state of things as remaining unaltered."   Gelston vs. Hoyt, 3 Wheaton's R., 246.   The Confederate government was never recognized by the government of the United States as a *legal, existing government.*

But it is contended that, although the State of Georgia may not have had the *legal* right to secede from the Federal Union, still she was *in fact* out of the Union for all political purposes, and was recognized by the government of the United States as a *belligerent enemy,* and therefore, according to the laws of war, she must be considered and treated as a State *out* of the Union; that all acts done under her authority whilst in that condition, including the confiscation of this railroad stock, were lawful and valid acts, and that the title of the original owners to the same was thereby *legally divested.* Before proceeding to discuss this branch of the case, it is proper to remark that the Common Law of nations, (which is a part of the Common Law of the land,) when in *conflict* with the principles and provisions of our American Federal Constitution and the form of government established thereby, or the laws enacted in pursuance thereof, must yield to the

The Central Railroad and Banking Co., *vs.* Ward *et al.*

latter.   The Common Law of nations, when repugnant to the positive provisions of the Constitution of the United States or the laws enacted in pursuance thereof, must be considered as *abrogated* or *repealed* by the latter.

But let us examine this question in accordance with the rules prescribed by the Common Law of nations.   Was the war in which the people of Georgia was engaged a *civil war* or a *rebellion?*   According to some writers upon international law, the distinction between a civil war and a rebellion, is where the malcontents have any just cause for taking up arms against the sovereign authority.   If they have, it is termed a civil war; if they have not, then it is termed a rebellion. Without pretending to decide whether the people of Georgia were engaged in a civil war, or a rebellion, it is quite certain that the war was prosecuted by the government of the United States upon the theory that it was a *rebellion,* and it was so declared by that government, in the most solemn form.   In view of important questions that may hereafter be presented to this Court for its consideration and judgment, the State of Georgia will be considered as occupying the position that the government of the United States has asssgned to her in regard to the war.   If, however, we consider the contest in which the people of Georgia were engaged with the government of the United States as a *civil war,* instead of a *rebellion,* the result must be the same, so far as the *political status* of the State is concerned, as well as the rights of the parties now before the court.   " A civil war," (says Vattel,) " breaks the bonds of society and government, or at least *suspends their force and effect :* it produces in the nation two independent parties, who consider each other as enemies, and acknowledge no common judge.   These two parties, therefore, must necessarily be considered as thenceforward constituting, *at least for a time,* two separate bodies, two distinct societies. Though one of the parties may have been to blame in breaking the unity of the State, and resisting the lawful authority, they are not the less divided in fact.   Besides, who shall judge them ?   Who shall pronounce on which side the right or the wrong lies?   On earth they have no common superior ;

they stand, therefore, in precisely the same predicament as two nations who engage in a contest, and being unable to come to an arrangement, have recourse to arms. This being the case, it is very evident that the common laws of war, those maxims of humanity, moderation and honor, which we have already detailed in the course of this work, ought to be observed by both parties in every civil war." Vattel, .425, section 293. Thus it is very clear that the common laws of war, were applicable to the belligerent parties during *the time the contest continued,*—during *the time* the sovereign authority of the government of the United States was *suspended* by the force of arms in the State,—they were during *that time* belligerent enemies, *so far only* as to observe those maxims of *humanity, moderation* and *honor* prescribed by the common laws of war, but they were *domestic* belligerent enemies, and not *alien* belligerent enemies, and that fact *negatives* the right of confiscation in this case, on the part of those who were *resisting* the sovereign authority of the government of the United States. Although the common laws of war are applicable to, and are to be observed *during the continuance of a civil war,* what is to be done when the sovereign authority of the government is asserted by force of arms over the State attempting to secede therefrom, and peace and order is restored *in a civil war?* "When the sovereign," (says Vattel,) "has subdued the opposite party and reduced them to submit and sue for peace, he may *except* from the amnesty the authors of the disturbances—the leaders of the party. He may bring them to a legal trial, and punish them if they be found guilty." Vattel, 426. This could not be done until the sovereign authority of the government had been restored over the State, the civil war suppressed, the enemies of that sovereign authority subdued, and peace maintained. It was undoubtedly the duty of the government of the United States to have protected the people of Georgia against both foreign and domestic enemies, to have maintained the sovereign authority of the United States over them ; but if, *for a time,* that authority was *suspended* by the force of arms in the hands of the domestic enemies of that government, what

was the duty of the government, when its authority was restored by force of arms, towards the people of the State, and what was the *political status* of the State according to the well-established principles of international law? We have already shown that the government might bring to trial the authors of the disturbance, and punish them, if found guilty, in case of a *civil war*, but what is the condition of the State, and the people thereof, at the termination of a civil war? "The sovereign," (says Vettel,) "is bound to protect the persons and property of his subjects, and to defend them against the enemy. When, therefore, a subject, or any part of his property, has fallen into the enemies possession, should any fortunate event bring them again into the sovereign's power, it is undoubtedly his duty to restore them to their former condition, to re-establish the persons in all their rights and obligations, to give back the effects to the owners; in a word, to replace everything on the same footing on which it stood previous to the enemy's capture. The justice or injustice of the war, makes no difference in this case." Vattel, 392, section 205. The proposition to be established is, that although by civil war the State of Georgia, *for a time*, may have been in the hands of and under the control of *domestic belligerent enemies* and the sovereign authority of the Government of the United States may have been *for a time suspended*; yet when that authority was restored by force of arms, the position of the State was *in the Union*, not only *de jure* but *de facto*, Vattel states, the principle which is applicable to the case: "If the sovereign retakes those towns, countries or prisoners, who had surrendered to the enemy, he recovers all his *former rights* over them, and is bound to re-establish them in their *pristine condition*." Vattel 394, section 210. The pristine condition of the State of Georgia, prior to the war, was one of the original thirteen sovereign States that formed the government of the United States, and then and now, constitutes an *integral part* of the sovereign authority of that government, the *unity* of which she could not destroy by her own act, unless the absolute legal right of separate State secession be *admitted*. If the State was *in the Union* upon

The Central Railroad and Banking Co., *vs.* Ward *et al.*

the suppression of a *civil war* both *de jure* and *de facto*, surely she was *in the Union* upon the suppression of a *rebellion* against the government of the United States.

According to these fundamental principles of international law, independent of the provisions of the Federal Constitution, the war was prosecuted, on the part of the Government of the United States, for the purpose of maintaining its sovereign authority over all the States which constituted an *integral part thereof*, and to preserve the *unity* of the same, for the protection of the citizens thereof, and their property. This being so, what were the rights of the original owners of this railroad stock, at the time of the attempted secession of the State, in 1861? They were citizens of one or more of the United States, which did *not attempt* to secede from the Federal Union. By the 2d section of the 4th article of the Constitution of the United States, it is declared, that "the citizens of *each State* shall be entitled to all privileges and immunities of citizens *in the several States.*" The owners of this railroad stock, then, at the time of the attempted secession of the State of Georgia, although citizens of another State within the Federal Union, had the lawful right to own, have, hold, and enjoy the title to the same *in this State,* under the supreme law of the land, which the war was prosecuted to uphold and maintain.

But it is contended that inasmuch as the war, which was prosecuted by the Government of the United States, for the maintenance of its sovereign authority over the States which attempted to secede therefrom, assumed the proportions of a *civil war,* therefore, an organization of these latter States, for the purpose of *resisting* the authority of the Government of the United States, could, under the claim of belligerent rights during such war, *lawfully* confiscate this railroad stock, as the property of alien enemies. In support of this position the decision of the Supreme Court of the United States, in the Prize cases, is relied on—2 Black's Rep., 666. In the case of Shortridge vs. Mason, in the Circuit Court of the United States, for North Carolina, reported in the American Law Review, for October, 1867, p. 95, Chief Justice Chase

35

says, in relation to the Prize cases, " but there is nothing in that opinion which gives countenance to the doctrine which counsel endeavors to deduce from it, that the insurgent States, by the act of rebellion, and by levying war against the nation, became foreign States, and their inhabitants *alien enemies.*" In the case of Shortridge vs. Mason, it was held to be *no defence* to an action for debt, that the defendant had been compelled to pay the amount of the debt, with interest, to a receiver under *the sequestration acts of the Confederate States.* In relation to the principles asserted by the Court in the Prize cases, it may be remarked, that whilst it may be lawful for the regular established Government, in order to maintain its sovereign authority over those who *attempted to resist it by civil war*, to confiscate the property of the latter, found within the military lines of the former, during the existence of the war, as a belligerent right; yet, it does not follow, that those who are engaged in revolution for the purpose of *resisting* the lawful authority of that Government, can claim the *lawful* right to confiscate the property of citizens who adhere to the lawful Government, as *alien enemies*, under the claim of a belligerent right to do so, the more especially when they *fail to make good that claim by force of arms.* In a *legal* point of view, the difference between the two cases will be at once apparent. The complainants, and those under whom they claim, derive their title to the railroad stock, under proceedings of an unauthorized, and unrecognized organization which has failed, and ceased to exist, and their title thereto being so derived, *failed with it.* It is the judgment of a majority of this Court, that the judgment of the Court below, upon this branch of the case, be reversed.

2. In regard to the other question made in this case, whether the Central Railroad and Banking Company are to be held liable as guarantors, or warrantors of the title to this stock, simply because the Company allowed the transfer of the stock to be made upon their books, under the facts and circumstances presented by the record, it is the unanimous opinion of the Court that the Company are not so liable. By the 9th section of the charter of the Company, cer-

tificates of stock therein are transferred on the books of the Company only by personal entry of the stockholder, his or her legal representative. The stock is not purchased of the Company, but of the party who represents himself to be the owner of it, who, when the terms of sale are consummated, directs the transfer to be made by his personal entry, or that of his legal representative, on the books of the Company, to his vendee. In the absence of any fraud or collusion, on the part of the Company, the mere transfer of the stock on the books thereof, by direction of the vendor to his vendee, does not make the Company liable as a guarantor, or warrantor, of the vendor's title to the stock. If the vendor's title to the stock is not good, the vendee must look to him from whom he purchased the stock, and to whom he paid *the consideration therefor*. There was an implied warranty on the part of the vendor of the stock that he had a valid title thereto. See Revised Code, section 2609. These cirtificates of stock are not such recognized currency as will protect the vendee thereof, as a *bona fide purchaser*. Revised Code, section 2597. It is the judgment of this Court, that the judgment of the Court below be affirmed upon this assignment of error in the record. Let the respective judgments be entered in accordance with the judgment of this Court.

[See the dissenting opinion of HARRIS, J., after the next case.]